## LEVIN v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. February 26, 1904.)

No. 1,969.

1. CONSTITUTION—CONSTRUCTION—NATURALIZATION—STATE COURTS MAY GRANT.
Under the congressional authority to establish a uniform rule of naturalization, granted by section 8 of article 1 of the Constitution, the Congress may lawfully empower courts of the states to admit qualified aliens to citizenship, and the courts of the states may legally exercise this power without legislative authority or permission from the states which created them.

2. SAME — CONSTRUCTION BY CONTEMPORANEOUS INTERPRETATION — LONG ACQUIESCENCE AND PRACTICE CONCLUSIVE.
The contemporaneous construction of a provision of the Constitution by those who framed it, the concurrence of statesmen, legislators, and judges in that construction, and the acquiescence and uninterrupted practice of all the departments of the government in the same interpretation for more than 100 years, conclusively determine the meaning and effect of the provision, and place it beyond the realm of doubt or debate.

3. SAME—AUTHORITY OF CONGRESS TO GRANT JUDICIAL POWER.
The judicial power granted by section 1, art. 3, of the Constitution, is the power to try the 10 classes of cases specified in section 2 of that article. Chisholm v. Georgia, 2 Dall. 475, 1 L. Ed. 440.
These sections do not prohibit the Congress from vesting judicial power in other cases in courts or magistrates of the states or in executive officers, where the exercise of such power by them is a necessary or appropriate means by which to use the powers granted by the Constitution to the legislative department or to the executive department of the government.

4. NATURALIZATION—COURTS HAVING COMMON-LAW JURISDICTION DEFINED.
Courts having common-law jurisdiction, within the meaning of that term in section 2165, Rev. St. [U. S. Comp. St. 1901, p. 1329], are those which have the power to punish offenses, to enforce rights, or to redress wrongs recognized by the common law, or courts which are governed by the principles, rules, and usages of the common law in the determination of some of the causes of which they have jurisdiction. The term is used to distinguish courts which have some common-law jurisdiction from those which have no jurisdiction save in equity, in admiralty, or in matters not involving offenses or rights under the common law.
It is not indispensable that a court should have all common-law jurisdiction to qualify it to naturalize aliens under this section. It is sufficient that it has some.

5. SAME—ST. LOUIS COURT OF APPEALS.
The St. Louis Court of Appeals has common-law jurisdiction, and is empowered to admit qualified aliens to citizenship, because it has common-law jurisdiction to issue, hear, and determine writs of habeas corpus, quo warranto, mandamus, and certiorari, and in the determination of actions at law it is generally governed by the principles, rules, and usages of the common law.

(Syllabus by the Court.)

In Error to the District Court of the United States for the Eastern District of Missouri.

Walter D. Coles, for plaintiff in error.

Bert. D. Nortoni (David P. Dyer and Horace L. Dyer, on the brief), for defendant in error.

Before SANBORN, THAYER, and HOOK, Circuit Judges.

SANBORN, Circuit Judge. Nathan Levin was indicted, tried, convicted, and sentenced to imprisonment for the term of five years by the United States District Court for the Eastern District of Missouri, for aiding, abetting, counseling, advising, and procuring aliens who were not entitled to naturalization to obtain certificates of citizenship from the St. Louis Court of Appeals by means of fraud and false statements, in violation of sections 5425 and 5427 of the Revised Statutes [U. S. Comp. St. 1901, pp. 3669, 3670]. He challenges the judgment against him upon the ground that these acts constituted no offense, because the St. Louis Court of Appeals had no jurisdiction to naturalize qualified aliens.

By section 2165 of the Revised Statutes [U. S. Comp. St. 1901, p. 1329], "a court of record of any of the states having common law jurisdiction and a seal and clerk" is expressly authorized by the Congress to naturalize qualified aliens, and to issue to them certificates of citizenship. The Constitution of the United States provides that the Congress shall have power "to establish a uniform rule of naturalization * * * to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States or in any department or officer thereof" (article 1, § 8), and that "this Constitution and the laws of the United States which shall be made in pursuance thereof * * * shall be the supreme law of the land and the judges in every state shall be bound thereby anything in the Constitution or laws of any state to the contrary notwithstanding" (article 6). The constitutional grant of power to do an act or to attain an end is an implied grant of plenary authority to select and use the appropriate means to accomplish the purpose contemplated. McCulloch v. Maryland, 4 Wheat. 316, 413, 422, 4 L. Ed. 579; Prigg v. Pennsylvania, 16 Pet. 536, 618, 619, 10 L. Ed. 1060. A thoughtful reading of these clauses of the Constitution, in the light of the familiar canon of construction to which reference has been made, suggests no lack of authority in the legislative department of the nation to grant, or in the courts of the states to accept and to exercise, the power to naturalize aliens bestowed upon them by the act of Congress.

Counsel for the plaintiff in error, however, contends with much cogency and ingenuity that a court of a state has no jurisdiction to admit aliens to citizenship (1) because Congress had no power under the Constitution to grant this authority to such a court; and (2) because, if it had that power, a court of common-law jurisdiction created by a state has no authority to accept or to exercise this power in the absence of legislative permission so to do from the state which established it. His argument in support of his first position runs in this

way: The Constitution provides that "the judicial power of the United States shall be vested in one Supreme Court and in such inferior courts as the Congress may from time to time ordain and establish" (article 3, § 1), and that "the judicial power shall extend to all cases" specified in article 3, § 2. Congress has no authority to grant any portion of this judicial power of the nation to any other courts than those created under these sections of the Constitution. Martin v. Hunter's Lessee, 1 Wheat. 304, 328–330, 4 L. Ed. 97; Houston v. Moore, 5 Wheat. 1, 27, 5 L. Ed. 19. The admission of aliens to citizenship is a judicial function. It is the exercise of judicial power. Spratt v. Spratt, 4 Pet. 393, 407, 7 L. Ed. 171. Therefore the Congress has no power to grant to a court of a state the judicial power to admit aliens to citizenship, and section 2165 and all other acts of Congress which by their terms bestowed this authority upon state courts are unconstitutional and void. In support of his second proposition he argues that a court of a state derives all its powers from the political entity which creates it; that, while such a court may perform judicial functions permitted by national legislation in cases in which the general power to discharge these functions is granted or allowed to it by the legislation of the state which creates it, no new or additional authority can be conferred upon it by the laws of the nation, and none can be exercised by it unless it is granted by the state laws which create the court, and vest and define its jurisdiction, and, inasmuch as the legislation of the state of Missouri has never granted to any court of that state the power or the permission to naturalize aliens in accordance with the laws of the United States, none of the courts of that state may lawfully exercise this authority. To sustain this argument he cites the decisions of the Supreme Court to the effect that where jurisdiction may be conferred upon the national courts by Congress, and that jurisdiction is not made exclusive, the state courts may exercise it if by the Constitution and laws of their state they are competent to take it (Houston v. Moore, 5 Wheat. 1, 27, 5 L. Ed. 19; Claflin v. Houseman, 93 U. S. 130, 136, 23 L. Ed. 833); the cases in which state courts have declined to sustain actions for fines, penalties, or forfeitures imposed by acts of Congress for the violation of national legislation (U. S. v. Lathrop, 17 Johns. 4, 8–10; Ely v. Peck, 7 Conn. 239, 244); and the case of Ex parte Knowles, 5 Cal. 300, in which the Supreme Court of that state held that, while Congress had no power to confer jurisdiction upon the courts of a state to admit aliens to citizenship, yet such courts might exercise that power in cases where its existence was recognized by the legislation of the state which established it.

These propositions and arguments of the counsel for the plaintiff in error are plausible and cogent. They might well have challenged debate—possibly they might have changed the course of legislation and of action—if they had been presented to the Supreme Court 100 years ago. At this late day, however, after the courts of the states have for more than a century, with the uniform acquiescence and consent of all the departments of the national government and of the state governments, exercised this authority to naturalize aliens granted to them by the acts of Congress, there is one answer which is equally fatal to both the propositions which counsel for the plaintiff in error here pre-

sents. It is that the contemporaneous interpretation of 'the provisions of the Constitution relative to this subject by those who framed it, the concurrence of statesmen, legislators, and judges in that construction, the acquiescence and uninterrupted practice of all the departments of the government in the same interpretation for more than 100 years, conclusively determine their meaning and effect, and place them beyond the realm of doubt or question. Stuart v. Laird, 1 Cranch, 298, 308, 2 L. Ed. 115; Cohens v. Virginia, 6 Wheat. 265, 419, 5 L. Ed. 257; Prigg v. Pennsylvania, 16 Pet. 539, 620, 621, 10 L. Ed. 1060; Ex parte Gist, 26 Ala. 156, 164; Dean v. Borchsenius, 30 Wis. 237. In the year 1790 the Congress passed the first act to establish a uniform rule of naturalization. That act empowered any common-law court of record in any one of the states to admit aliens to citizenship upon their compliance with the terms of the law, but gave no such authority to any court of the United States. 1 Stat. 103. Many of the statesmen who sat in the convention which framed the Constitution were members of the Congress which passed this law. This act of Congress is therefore a contemporary interpretation—a practical exposition of the meaning and effect—of the grant to Congress of the power to establish a uniform rule of naturalization by the very men who, as the representatives of the people of the United States, gave this authority to the legislative department of the national government. From the . day when this act gave the courts of the states the power to issue certificates of citizenship to qualified aliens to the present moment, through all the legislation and judicial action of more than a century, that grant to the state courts has been maintained undisturbed, and the power thus bestowed has been exercised by the courts of the states with the uninterrupted acquiescence of the legislative, executive, and judicial departments of the nation and of the states. 1 Stat. 414; Act April 14, 1802, c. 28, 2 Stat. 153, 155; Rev. St. § 2165; U. S. Comp. St. p. 1329; Claflin v. Houseman, 93 U. S. 130, 140, 23 L. Ed. 833; Robertson v. Baldwin, 165 U. S. 275, 279, 17 Sup. Ct. 326, 41 L. Ed. 715. This contemporaneous, continuous, and uniform affirmance of the constitutionality of the grant to the state courts of this power to naturalize aliens, and this uninterrupted practice of the state courts to exercise the power thus bestowed upon them, are too long-continued, too strong, too obstinate, to be controlled or shaken now. It is too late to question the constitutionality of the devolution of this authority upon the courts of the states, or their jurisdiction to exercise it. Those issues have been settled by prescription and practice, and they are no longer open to debate or question.

Nor are the conclusions which contemporaneous construction, time, and practice have adopted without cogent reasons to support them. While it is true that Mr. Justice Story, speaking for the Supreme Court, declared in 1816, in Martin v. Hunter's Lessee, 1 Wheat. 304, 328–333, 4 L. Ed. 97, that the Congress could not vest any portion of the judicial power of the nation in courts which it did not itself ordain and establish, and this statement has since been repeated, the fact is that he was then thinking and speaking of the judicial power granted by section 1, and defined by section 2, of article 3 of the Constitution. The better opinion now is that the judicial power granted by the former

section, which may be vested in the national courts only, is defined in the latter section; that it necessarily extends only to the trial of "all cases in law and equity arising under this Constitution," and to the trial of the other nine classes of cases named in section 2, and specified by Chief Justice Jay in his opinion in Chisholm v. Georgia, 2 Dall. 419, 475, 1 L. Ed. 440 (Ex parte Gist, 26 Ala. 156, 162; Claflin v. Houseman, 93 U. S. 130, 139, 23 L. Ed. 833; Robertson v. Baldwin, 165 U. S. 275, 279, 17 Sup. Ct. 326, 41 L. Ed. 715); and that these sections neither expressly nor impliedly prohibit the Congress from conferring judicial power upon other courts, or upon executive or other officers, in other cases, where, in its opinion, the devolution of such power is either necessary or convenient in the execution of the authority granted to the legislative or to the executive department of the government through the Constitution. Thus the authority granted to territorial courts to hear and determine controversies arising in the territories of the United States is judicial power. But it is not a part of that judicial power granted by section 1, and defined by section 2, of article 3 of the Constitution. Nevertheless, under the constitutional grant to Congress of power to "make all needful rules and regulations respecting the territory * * * belonging to the United States" (article 4, § 3), that body may create territorial courts not contemplated or authorized by article 3 of the Constitution, and may confer upon them plenary judicial power, because the establishment of such courts and the bestowal of such authority constitute appropriate means by which to exercise the congressional power to make needful rules respecting the territory belonging to the United States. American Ins. Co. v. Canter, 1 Pet. 511, 544, 7 L. Ed. 242; Clinton v. Englebrecht, 13 Wall. 434, 447, 20 L. Ed. 659; McAllister v. U. S., 141 U. S. 174, 184, 188, 11 Sup. Ct. 949, 35 L. Ed. 693. Of the same nature is the judicial power conferred upon the Secretary of the Interior, the Commissioner of the General Land Office, and his subordinate officers, to hear and determine claims to the public lands of the nation (U. S. v. Winona & St. Peter R. Co., 67 Fed. 948, 957, 15 C. C. A. 96, 104); that bestowed upon justices of the peace and other magistrates of the states by Act Sept. 24, 1789, c. 20, § 33, 1 Stat. 91, to arrest and commit or bail persons charged with a violation of the criminal laws of the United States (Ex parte Gist, 26 Ala. 156, 164); that conferred upon the state courts to hear and determine suits by or against corporations and officers created by the nation (Bank of the United States v. Deveaux, 5 Cranch, 61, 3 L. Ed. 38; Claflin v. Houseman, 93 U. S. 135, 23 L. Ed. 833); that given to magistrates of any county, city, or town corporate to hear, determine, and certify the claims of owners of fugitive slaves under Act Feb. 12, 1793, c. 7, 1 Stat. 302, § 3 (Prigg v. Pennsylvania, 16 Pet. 536, 615, 620, 621, 10 L. Ed. 1060); that bestowed upon justices of the peace to arrest, commit to jail, and deliver to the master deserting seamen, under Act July 20, 1790, c. 29, 1 Stat. 131, 134 (Robertson v. Baldwin, 165 U. S. 275, 277, 280, 17 Sup. Ct. 326, 41 L. Ed. 715); that conferred upon the courts of the states by the various acts of Congress which empower them to naturalize aliens (1 Stat. 103, 414; 2 Stat. 153, 155; Rev. St. § 2165; Robertson v. Baldwin, 165 U. S. 27, 17 Sup. Ct. 326, 41 L. Ed. 715; Claflin v. Houseman, 93 U. S. 130, 140, 23 L. Ed. 833; In

the Matter of Martin Conner, 39 Cal. 98, 101, 2 Am. Rep. 427); and that granted by acts of Congress to executive officers of the United States to courts and magistrates of the states in numerous other instances, not to try and determine the cases specified in section 2 of article 3 of the Constitution, but to perform the judicial function of hearing and determining other questions and issues which a proper exercise of the powers granted to the various departments of the government require to be thus decided. The grant by the Congress of the United States of the judicial power to admit aliens to citizenship, and to hear and decide the various questions which do not arise in the cases specified in article 3 of the Constitution, but which a proper exercise of the powers granted by that instrument to the executive or to the legislative department of the Government requires to be judicially decided, was neither expressly nor impliedly prohibited by that article. The congressional power to make such a grant, and to vest judicial authority in state courts and officers, in such cases, exists by virtue of the established rule that the grant of a power to accomplish an object is a grant of the authority to select and use the appropriate means to attain it.

Nor does the contention that the courts of the state of Missouri having common-law jurisdiction are without authority to accept or to exercise the judicial power to naturalize aliens conferred upon them by Congress, because the state which established them has never by any legislative action empowered or permitted them to do so, commend itself to our judgment. The suggestion is noted that the Legislature of a state might prohibit its courts from exercising the power to naturalize aliens, and that this prohibition would be fatal to the devolution of the congressional authority. No such inhibition, however, has been imposed upon the courts of Missouri, and it is unnecessary and would be injudicious to consider and determine in this case what the effect of such legislation might be. That question is not here for consideration. The state of Missouri was admitted to the Union and became a part of this nation in the year 1820. More than 30 years before its admission the Constitution of the United States had empowered Congress to establish a uniform rule of naturalization, and to make all laws necessary to carry that authority into execution. In the exercise of this power, Congress had enacted laws which conferred upon certain courts of the states and territories the judicial power to issue certificates of citizenship to qualified aliens. The Constitution provided that "this Constitution and the laws which shall be made in pursuance thereof * * * shall be the supreme law of the land and the judges in every state shall be bound thereby, anything in the Constitution and laws of the state to the contrary notwithstanding." When the United States offered admission to the Union to the people of Missouri, it made this offer subject to the patent condition that the Constitution of the United States, and the laws that had been made and should be made by Congress in accordance with its provisions, should become the supreme law of the new state, binding alike upon all its inhabitants, whether laymen or lawyers, citizens or judges. The people of Missouri accepted this offer and its condition, and became a part of the nation. Thereupon the Constitution of the United States, and the laws

enacted in accordance with it, which then conferred upon the courts of the states the judicial power to admit aliens to citizenship, became a part of the supreme law of the new state of Missouri, which the people of that state, by their acceptance of the offer of admission, had contracted should be obeyed and executed by the citizens, the judges, and the courts of their state. The acceptance by the people of Missouri of this offer of admission, in view of the power which had then been granted by the Congress to certain courts of the states to admit aliens to citizenship, and in view of the practice of those courts to exercise this jurisdiction, which had then prevailed for nearly three decades, gave to the courts of Missouri plenary jurisdiction to exercise any power to admit aliens to citizenship which the Congress had then conferred or might thereafter bestow upon them under the provision of the Constitution applicable to that subject. Claflin v. Houseman, 93 U. S. 130, 136–142, 23 L. Ed. 833; Ex parte Gist, 26 Ala. 156, 164; Prigg v. Pennsylvania, 16 Pet. 536, 620, 10 L. Ed. 1060; Robertson v. Baldwin, 165 U. S. 275, 280, 17 Sup. Ct. 326, 41 L. Ed. 715. The resistless conclusion is that the Congress of the United States was by section 8, art. 1, of the Constitution, granted the necessary authority to vest in the courts of the states having common-law jurisdiction the judicial power to admit qualified aliens to citizenship; that, in the absence of legislative authority or permission from the states which created them, such courts may lawfully exercise this power, and that section 2165 of the Revised Statutes is neither unconstitutional nor invalid.

Finally it is insisted that section 2165 of the Revised Statutes did not confer jurisdiction upon the St. Louis Court of Appeals, because it is a court of appellate, and not of original, jurisdiction, and because it is not a court having common-law jurisdiction. The act of Congress does not limit its grant to courts of original jurisdiction, but extends it to all courts of record which have common-law jurisdiction, seals, and clerks. As Congress did not except appellate courts from the beneficiaries of this grant, it is neither the province nor the duty of the courts to do so. The remaining question is, has the St. Louis Court of Appeals common-law jurisdiction? Courts having common-law jurisdiction, within the meaning of this section, are those which have the power to punish offenses, to enforce rights, or to redress wrongs recognized by the common law, or which, in the determination of the causes which they decide, are governed by the principles, rules, and usages of that law. The term "having common-law jurisdiction" is used to distinguish these courts from those which have no jurisdiction save in equity, in admiralty, or in matters not involving offenses or rights under the common law. U. S. v. Lehman (D. C.) 39 Fed. 49, 50; Parsons v. Bedford, 3 Pet. 446, 447, 7 L. Ed. 732; In the Matter of Martin Conner, 39 Cal. 98, 101, 2 Am. Rep. 427; People ex rel. v. McGowan, 77 Ill. 644, 20 Am. Rep. 254. Courts which have some common-law jurisdiction are courts having common-law jurisdiction, and it is not indispensable to the qualification of a court under this act of Congress that it should have all the common-law jurisdiction, or even that it should have general common-law jurisdiction. Ex parte Tweedy, 22 Fed. 84; In the Matter of Martin Conner, 39 Cal. 98, 101,

2 Am. Rep. 427; U. S. v. Power, 14 Blatchf. 223, Fed. Cas. No. 16,080, 27 Fed. Cas. 607, 608; Ex parte Gladhill, 8 Metc. (Mass.) 168, 170. The common law of England and all the statutes and acts of Parliament made prior to the fourth year of James I constitute the rule of action and decision of all the courts of the state of Missouri, wherever they are not inconsistent with the Constitution of the United States, the Constitution of the state, or the statutes in force for the time being. Rev. St. Mo. 1899, § 4151. The St. Louis Court of Appeals is an appellate court vested with appellate jurisdiction to review the decisions of the inferior courts of certain counties of the state of Missouri in cases in which the amount involved does not exceed $4,500, and with original jurisdiction to issue writs of habeas corpus, quo warranto, mandamus, certiorari, and other remedial writs, and to hear and determine the same. Const. Mo. art. 6, § 12; Rev. St. Mo. 1899, p. 92; Laws Mo. 1901, p. 107; State ex rel. Schierberg v. Green, 1 Mo. App. 226, 227. The writs of habeas corpus, quo warranto, mandamus, and certiorari are common-law writs, and in the issue, the hearings, and decisions upon them the St. Louis Court of Appeals necessarily has and exercises common-law jurisdiction. In the hearing and decision of actions at law presented to it for review, its rule of action and decision must in the great majority of cases be the rules, principles, and usages of the common law. Hence it is a court having common-law jurisdiction, and it falls in the class of state courts upon which Congress had conferred the jurisdiction to admit qualified aliens to citizenship. The aiding, the abetting, the counseling, advising, or procuring, aliens who are not entitled to naturalization to obtain certificates of citizenship from this court by fraud and false statements, is one of the offenses denounced by section 5427 of the Revised Statutes, and there is no escape from the conclusion that the judgment below must be affirmed. It is so ordered.