### In re GOLDBERG.

(District Court, E. D. Missouri, E. D.   December 17, 1920.)

No. 9010.

**Aliens ☞62—Qualifications for citizenship stated.**

It is an indispensable prerequisite to the admission of an alien to citizenship that he possess an acquaintance with and working knowledge of the Declaration of Independence and Constitution of the United States, and have a comprehension of the obligations and responsibilities of citizenship arising from his taking the oath of allegiance, and it is not sufficient that during his residence he has been peaceable, industrious, of good character, and law-abiding.

Petition of Bear Goldberg for naturalization.   Denied.

M. R. Bevington, Chief Naturalization Examiner, of St. Louis, Mo., for the United States.

DYER, District Judge. The question presented by this case is what degree of acquaintance with American institutions and ideals is essential, on the part of a candidate for naturalization, to warrant favorable action upon his petition.   To state the question another way, how ignorant may an alien be of American institutions and ideals, and still be admitted to citizenship?   Although this question is one of of the gravest any naturalization judge can be called upon to determine, there appears to be but one modern authority to be found in the reports, that of In re Meakins (D. C.) 164 Fed. 334, 335, in which Judge Whitson most clearly states:

" * * * While it may not be impossible for one to be attached to the principles of the Constitution of the United States, who is without definite knowledge of the workings of the government in detail, he must have sufficient general information concerning it as to enable him to give a reason for his faith; and where, as in this case, an applicant does not know how the laws are made, who makes them, nor how they are enforced, he is illy prepared to participate in the selection of the persons who shall perform those duties. He cannot be attached to principles of which he is entirely ignorant. * * *"

The candidate represents in his own behalf that he has resided continuously within the United States for more than five years immediately preceding the date of his petition, that he has at all times behaved as a man of good moral character, that he has been law-abiding, industrious, and that his family life has been all that it should be. But is the boon of citizenship to be granted on a showing of this character?   I think not.   All the matters presented by the petitioner constitute nothing more than the duty any good citizen owes himself, his country, and his God.   As stated by Mr. Justice Van Devanter, speaking for the Supreme Court of the United States in the case of Luria v. United States, 231 U. S. 22, 34 Sup. Ct. 13, 58 L. Ed. 101:

" * * * Citizenship is membership in a political society, and implies a duty of allegiance on the part of the member and a duty of protection on the part of the society.   These are reciprocal obligations, one being a compensa-

tion for the other. Under our Constitution, a naturalized citizen stands on an equal footing with the native citizen in all respects, save that of eligibility to the Presidency. Minor v. Happersett, 21 Wall. 162, 165; Elk v. Wilkins, 112 U. S. 94, 101; Osborn v. Bank, 9 Wheat. 738, 827. * * *"

And again (231 U. S. on page 23, 34 Sup. Ct. 13, 58 L. Ed. 101):

"* * * In other words, it was contemplated that his admission should be mutually beneficial to the government and himself; the proof in respect of his established residence, moral character, and attachment to the principles of the Constitution being exacted because of what they promised for the future, rather than for what they told of the past. * * *"

While a candidate for naturalization is to be commended for having acquired material wealth, and for having lived a blameless life, during his period of residence here, nevertheless such a state of affairs does not relieve him in any way of the necessity of possessing a working knowledge of the form and general structure of our government, and of the responsibilities and duties, as well as the privileges of a citizen thereof. Lacking such qualifications, it is impossible for him to swear, either intelligently or conscientiously, that, as required by law, he is "attached to the principles of the Constitution of the United States," or that he is "well disposed to the good order and happiness of the same." Under our form of government, the people, theoretically, at least, make, interpret, and execute the laws. Accordingly, their reasonable intelligence and education are indispensable prerequisites to the preservation and transmission of civil liberty and republican institutions.

The requirements of law cannot be held to have been met on a mere showing of the candidate that he is peaceable, industrious, of good character, and law-abiding. By reference to decisions of the courts announced prior to the Naturalization Act of 1906 (34 Stat. pt. 1, p. 596), and during the period the government did not, as now, exercise supervision of the naturalization of aliens, we find declared in In re Naturalization, 5 Pa. Dist. R. 597, that no person will be naturalized who has not a general familiarity with the federal Constitution and with our method of government, state and national. The act of Congress requires each applicant to take an oath that he is attached to the principles of the Constitution. No applicant will be permitted to so swear unless he knows what these principles are. No person should be naturalized who has not some general comprehension of what the Constitution of the United States is and of the principles which it affirms. In re Bodek (C. C.) 63 Fed. 813. Also see Rushworth v. Judges, 58 N. J. Law, 97, 32 Atl. 743, 30 L. R. A. 761; In re Conway, 9 Misc. Rep. 652, 30 N. Y. Supp. 835; In re Lab's Petition, 3 Pa. Dist. R. 728, 5 Pa. Dist. R. 597; In re Kanaka Nian, 6 Utah, 259, 21 Pac. 993, 4 L. R. A. 726. The applicant's oath to support the Constitution of the United States will not be accepted, if, upon examination, it appears that he does not understand its significance, or is without such knowledge of the Constitution as is essential to the rational assumption of an understanding to support it. In re Bodek, supra.

Any detailed consideration of the question of law involved in this case at once raises the inquiry as to the causes that brought about the

enactment of the present naturalization statute, which has in opera-
tion proved a most workable and satisfactory rule. The people of
this country are indebted for their present naturalization statute, as
they are indebted for numerous other beneficent laws that actually
protect their interest, to Theodore Roosevelt, then President of the
United States, who on December 5, 1905 (Doc. No. 46, 59th Congress,
1st Session), called upon the law-making body to bring to an end the
notorious naturalization frauds that had shocked the country for
years. In United States v. Janke (D. C.) 183 Fed. 278, we find this
picture of the times, by Judge Amidon:

"In the year 1906 Congress had before it for months the question of the
proper regulation of the admission of foreigners to citizenship. The subject
had been brought impressively before the country by the discovery that ex-
tensive frauds had been committed under the laws then in force. In cases
arising at St. Louis (Levin v. U. S., 128 Fed. 826, 63 C. C. A. 476; Dolan v.
U. S., 133 Fed. 440, 69 C. C. A. 274) it appeared that corrupt politicians, in
order to forward their corrupt purposes, had gathered together mobs of for-
eigners and brought them to the courthouse, grouped according to their
nationality—Huns, Italians; Armenians, and Jews. They were collected in
the corridors of the courthouse, and each band placed under the generalship
of a policeman, and then marched in blocks before the judges of one of the
high courts of that city, and there, under a merely formal ceremony, in
which the oath was administered to the entire block, they were admitted as
citizens. In some cases the formality of going before the court was omitted,
and citizenship papers issued to lists furnished by ward politicians. Upon
investigation it was found that many of these people had been in the United
States for only a few days. Similar frauds were subsequently discovered in
other cities."

The same court, in United States v. Lenore (D. C.) 207 Fed. 867,
868, makes the further statement:

"In 1902 fraudulent and illegal practices in the naturalization of aliens
were discovered in the city of St. Louis, Mo. Some of these misdoings are re-
counted in the opinion in Dolan v. United States, 133 Fed. 440, 69 C. C. A.
274. The prosecutions which resulted in the Eastern district of Missouri led to
investigations in other cities, and the discovery of many fraudulent and ille-
gal practices in the issuance of certificates of naturalization. In some cases
perjury and subornation of perjury were resorted to for the purpose of de-
ceiving the court and obtaining certificates for aliens who had not resided in
the country for the requisite time. In other cases foreigners were marched
into the court in large companies, and the oath of allegiance administered to
the whole company, although many of them were unable either to speak or
understand the language that was used. Two persons made the ordinary
witness' oaths for the whole company. Upon this sham and spurious proceed-
ing certificates were issued. In other cases clerks of court issued such certifi-
cates without any proceeding in court whatever, and fabricated a judicial
record to support the certificates. It was even discovered that some clerks
were engaged in a regular brokerage business in certificates of naturalization.
This practice went so far that some of these certificates were sold to aliens
residing abroad, who had never been in the United States, in order that they
might be used for fraudulent purposes, both with respect to foreign countries
and this country. The result of these investigations was gathered together
in an elaborate report, which was presented to Congress and resulted in the
passage of the act of 1906. Congressional Record, vol. 40, part of page 7036;
House Documents, col. 44 (Miscellaneous) 59th Congress, 1st Session."

The legislation adopted, as a result of President Roosevelt's insist-
ence, while containing safeguards not previously found in our laws
on the subject, and while reserving to the United States the right to
appear and to be heard in connection with every naturalization ap-

plication, was nevertheless not self-enforcing. So we find this complaint upon reference to the annual report of the Commissioner of Naturalization for the year 1918, page 9:

"It is perhaps a natural consequence arising from the lax and informal procedure under the old system, but it is a fact that some of the judges have appeared to think the bureau entirely too technically exacting in its persistent view that the law must be complied with in its every detail, and that the entire burden and responsibility of establishing beyond reasonable doubt his personal fitness for citizenship rests upon the petitioner. Whether the courts, consciously or not, hold this view, their rulings in too many cases indicate their position to be that the allegations in his petition constitute all that is required of a petitioner, and that, having made them in the manner required, the petition is to be treated as a rule against the government, to show cause why he should not be admitted, thus casting upon the government the burden of refuting the allegations made. To illustrate: A petitioner claims good behavior and love of American institutions and their basic principles; witnesses testify to good behavior and consequent belief of the attachment professed. Thus the case is made up. If the government cannot produce evidence of misconduct or disloyalty, under this view the petitioner is entitled to be naturalized. In other words, his fitness to become a citizen and his loyalty after being admitted is assumed beforehand, just as under our system of criminal jurisprudence every man is assumed to be innocent of any crime until the contrary is proved, and the burden of proving unfitness and disloyalty rests upon the government, as in a proceeding for conviction of crime or misdemeanor. Fortunately such instances of judicial misconception are few, but they are sufficiently persistent to justify, or rather to require, that attention be drawn to them."

And again, for the year 1914, pp. 16, 17:

"Under the report on the field service of the bureau consideration will be given to the list of denials for failure to comply with the law. It is sufficient to say under the present heading that there is a strong disinclination in some of the courts to strictly enforce the naturalization law and deny petitioners who may possess the personal statutory qualifications, but in whose applications there appear omissions of some one or more requirements of the law, either on the part of such petitioners, or, especially, on the part of clerks of courts. This attitude of the courts may be summed up tentatively in these words: 'I know that this is a good man and that he will make a most desirable citizen. To satisfy the court upon this point is the single purpose of all the formal or technical requirements of the law. As I am already satisfied upon this vital point, what is the use, either as regards the welfare of the public or the ultimate result, of denying this petitioner, and putting him to the consequent mortification, delay, and additional cost, merely to force him or the clerk of this court to supply the omission of a technicality which in this case is useless?'

"This view is appealing, if not conclusive, to the nonprofessional mind, which is proud of its ignorance of the law and its methods, and of its unquestionable claim to perfect acquaintance with the rules of common sense. Its essence, however, is plainly a judicial proviso attached to a legislative enactment by which—in those cases in which the processes of the judicial mind perceive the legislative method to be not simply useless, but actually obstructive of the purpose sought by the legislative branch of the government—the court dispenses in whole or in part with the technical formalities of the naturalization law. Fortunately instances of this kind are of less frequent occurrence each year, though still sufficent in number to be the occasion of reasonable apprehension to administrative officers that dangerous precedents are being established, which threaten the efficiency of the present law. When the law requires a specified physical presence, will hypothetical or constructive presence, but actual physical absence, be a sufficient compliance with its terms? When the law says 'continuous,' does it mean unbroken, or does it, between the lines, convey the assurance that, if the break in continuity is not too long, or if caused by a commendable response to some call of natural duty, discon-

tinuity will not be seriously regarded? Is the 'personal' knowledge required of witnesses in regard to a petitioner's qualifications merely an ignorance on their part of his lack of such qualifications? When the required legal posting of the notice of the names of petitioner and his witnesses has not been complied with for the statutory period, may it be held that a petitioner is legally before the court and that the law in respect thereto is merely 'directory,' and the failure to post is not the fault of the petitioner but of the clerk of the court?

"These and many similar questions are arising daily, and if the courts were to be guided by the theory above propounded it seems clear that the process of 'construction' of law would degenerate into a process of destruction and the ultimate crumbling away of many of the provisions which, whether necessary or not, are still a part of the law of the land, to the support of which all those engaged in applying it have pledged themselves under solemn oath."

The law, however, is succinctly stated by Mr. Justice Pitney, in Johannessen v. United States, 225 U. S. 240, 32 Sup. Ct. 616, 56 L. Ed. 1066, in the following language:

"An alien friend is offered under certain conditions the privilege of citizenship. He may accept the offer and become a citizen, upon compliance with the prescribed conditions, but not otherwise. His claim is of favor, not of right. He can only become a citizen upon and after a strict compliance with the Acts of Congress. An applicant for this high privilege is bound, therefore, to conform to the terms upon which alone the right he seeks can be conferred. It is his province, and he is bound, to see that the jurisdictional facts upon which the grant is predicated actually exist, and if they do not he takes nothing by his paper grant"

—and by Mr. Justice McReynolds in United States v. Ginsberg, 243 U. S. 474–475, 37 Sup. Ct. 422, 425 (61 L. Ed. 853):

"An alien, who seeks political rights as a member of this nation, can rightfully obtain them only upon terms and conditions specified by Congress. Courts are without authority to sanction changes or modifications; their duty is rigidly to enforce the legislative will in respect of a matter so vital to the public welfare. * * * No alien has the slightest right to naturalization, unless all statutory requirements are complied with; and every certificate of citizenship must be treated as granted upon condition that the government may challenge it, as provided in section 15, and demand its cancellation unless issued in accordance with such requirements. 'If procured when prescribed qualifications have no existence in fact, it is illegally procured; a manifest mistake by the judge cannot supply these, nor render their existence nonessential."

The problem under consideration is not one that concerns the courts alone. On the contrary, it is a problem that vitally affects every man, woman, and child within the United States. By way of illustration, reference may properly be made to the fact that during the period 1900–1914, inclusive, 13,377,087 immigrants were admitted to the United States. Of these, 11,726,606 were over 14 years of age, and of this latter group 3,116,182 were illiterate in their own tongue— a proportion of 26.55 per cent. of illiterates over 14 years of age; 48.1 per cent. of these illiterates were between the ages of 20 and 45 years; only 16 per cent. of these illiterates were under 20 years of age. Much of this immigration was from the so-called oppressed lands. Because of conditions surrounding them prior to their emigration to America it is not to be wondered at that a considerable number of these immigrants may hate any government, and that to them all government is obnoxious. We cannot escape the fact that our candidates for citizenship must necessarily come from these immigrants.

Nor can we ignore the fact that the unfit, as well as the fit, present themselves for citizenship. In re Clark, 18 Barb. (N. Y.) 444; In re Spencer, Fed. Cas. No. 13,234, 5 Sawy. 195; Ex parte Douglass and Sandburg, 5 West. Jur. 171; In re Guliano (D. C.) 156 Fed. 420; In re Di Clerico (D. C.) 158 Fed. 905; In re Ross (C. C.) 188 Fed. 685; United States v. Ollson (D. C.) 196 Fed. 562; In re Talarico (D. C.) 197 Fed. 1019; In re Trum (D. C.) 199 Fed. 361; United States v. Bressi (D. C.) 208 Fed. 369; In re Centi (D. C.) 211 Fed. 559; United States v. Raverat (D. C.) 222 Fed. 1018; In re Hartman (D. C.) 232 Fed. 797; United States v. Wursterbarth (D. C.) 249 Fed. 908; United States v. Darmer (D. C.) 249 Fed. 989; In re Addis (D. C.) 252 Fed. 886; United States v. Swelgin, 254 Fed. 884; United States v. Kramer (C. C. A.) 262 Fed. 395; In re Kornstein (D. C.) 268 Fed. 172.

At the last session of Congress, figures were presented to the committee on immigration and naturalization of the House of Representatives, during its hearings on H. R. 10404, to the effect that at that time there were in round numbers about 11,000,000 adult aliens in the United States; that of these some 2,500,000 had filed their declarations of intention, leaving approximately 8,500,000 who had never taken any step whatsoever towards citizenship. It is quite apparent from these figures that the "melting pot" has not melted. This was repeatedly emphasized during the World War. The line of racial cleavage was as distinctly drawn in this country then as in Europe. Very considerable portions of our population of foreign birth seemed concerned more with what was best for the lands of their nativity rather than with what was best for the country of their adoption. Cases such as Schurmann v. United States (C. C. A.) 264 Fed. 917, deal with this situation. This foreign element must either be lifted up to American standards, or America must eventually be reduced to their standards. We must become all-American, or, failing this, we will in time become all-alien. And before any given candidate is clothed with the right of franchise under our naturalization laws, he should be required to make a convincing showing that the Americanization process in his case has reached the stage where he is heart and soul with us, and that his naturalization would be more a benefit than a detriment to the country. If any doubt should be entertained as to the soundness of this conclusion, it is necessary only to consider the present flood of immigration (all prospective candidates for naturalization), which in the short time that has elapsed since the Armistice has reached the pre-war height. Limitations due to shipping have alone kept the country from being flooded. So critical has become the situation that the present Congress has been appealed to, to suspend all immigration for a reasonable period of time.

The courts are chargeable with no further duty in a case such as we are here considering than to see that the individual candidate has fittingly prepared himself for citizenship. But even a casual consideration of such a case must, however, convince any thoughtful person that as an indispensable prerequisite to naturalization the candidate must possess an acquaintance with, and working knowledge of, the principles of the Declaration of Independence and Constitution of the United States. An intelligent sympathy with, and understanding

of the purposes of these great charters of human liberty must be shown by the candidate, and he must have a comprehension of the obligations and responsibilities of citizenship arising from his taking the oath of allegiance forming a part of his naturalization proceeding.

The candidate, in the instant case lacking these essentials, his petition will be denied.