**STATE ex rel. MILLER et al. v. HUSER, Okfuskee County Judge.**

No. 10517—Opinion Filed July 15, 1919.

Rehearing Denied Oct. 7, 1919.

(Syllabus by the Court.)

**1. Courts—Grant by Congress of Additional Jurisdiction to State Courts and Officers.**

The judicial power granted by section 1, art. 3. of the Constitution of the United States, is the power to try the ten classes of cases specified in section 2 of that article; but said sections neither expressly nor impliedly prohibit the Congress from conferring judicial power upon other courts, or upon executive or other officers, in other cases, where, in its opinion. the devolution of such power is either necessary or convenient in the execution of the authority granted to the legislative or to the executive department of the government through the Constitution. The congressional power to make such grant and to vest such power in state courts and officers, in such cases, exists by virtue of the established rule that the grant of a power to accomplish an object is a grant of the authority to select and use the appropriate means to attain it. Levin v. United States, 128 Fed. 826, 63 C. C. A. 476.

**2. Same—Indian Affairs.**

The government of the Indians of the Five Civilized Tribes and the management of their property and affairs is a political and administrative function, and the power and duty of the United States to legislate for restricted Indians and their property during the continuance of the national guardianship over them is well established, and it is entirely competent for Congress to confer upon and delegate to individuals, courts, commissions, boards, tribunals, or other agencies administrative or ministerial duties, even though such duties involve the exercise by them of judicial or quasi judicial power.

**3. Same—State Courts—Conferred Jurisdiction.**

The Act of Congress of June 14, 1918 (40 Stat. 606, c. 101, sections 4234a, 4234b, Append. Comp. St. 1918), entitled "An act to provide for a determination of heirship in cases of deceased members of the Cherokee, Choctaw, Chickasaw, Creek, and Seminole Tribes of Indians in Oklahoma, conferring jurisdiction upon district courts to partition lands belonging to full-blood heirs of allottees of the Five Civilized Tribes, and for other purposes," is not unconstitutional and void, nor in contravention of sections 1 and 2, art. 3, of the Constitution of the United States, but is a proper and lawful exercise of the political and administrative power and duty of Congress to legislate for restricted Indians of the Five Civilized Tribes concerning their property during the continuance of the national guardianship over such restricted Indians.

**4. States — Federal Legislation — Supreme Law.**

The national government, though limited in its powers, is supreme, and its laws, when made in pursuance of the Constitution of the United States, form the supreme law of the land, "anything in the Constitution or laws of any state to the contrary notwithstanding." McCulloch v. Maryland, 17 U. S. (4 Wheat.) 316, 4 L. Ed. 579.

**5. Indians — Congressional Acts Supreme— State Law—Courts.**

The plenary authority of congress to legislate for full-blood members of the Five Civilized Tribes concerning their restricted lands cannot be limited or impaired by the Constitution or laws of the state, and section 12, art. 7, of the state Constitution, does not prohibit the county courts from exercising the authority conferred on said courts by the Act of Congress of June 14, 1918 (U. S. Comp. St. 1918, secs. 4234a, 42334b, Appen.)

**6. Same.**

The state has not prohibited county courts from exercising the authority conferred on them by said act, but, on the contrary, has specifically sanctioned it.  Chapter 25, Sess. Laws 1919.

**7. Same—Powers of Courts.**

The power and authority conferred on the county courts by said act, though it involves the exercise by said courts of judicial or quasi judicial power, is not strictly judicial, but is administrative and ministerial, and in determining, pursuant to said act, as a question of fact who are the heirs of any deceased citizen allottee of the Five Civilized Tribes, the court merely finds the facts and fixes the status, which finding, when material to the question at issue, is conclusive and binding upon the state courts and upon the administrative officers of the national government in determining questions arising under acts of Congress to which it is applicable. The act, however, does not deprive the district courts of this state of jurisdiction of suits involving lands allotted to an Indian of the Five Civilized Tribes who may die or may have heretofore died leaving restricted heirs, where such suit necessarily includes the determination of the title, and, incidentally, the question of fact as to who are the heirs of said deceased allottee.

**8. Same—Writ of Prohibition.**

Prohibition will not lie to restrain a county court from proceeding under the Act of Congress of June 14, 1918 (U. S. Comp. St. 1918, secs. 4234a, 4234b, Appen.), as an administrative agency of the United States government to determine the question of fact as to who are the restricted Indian heirs of a deceased citizen allottee of the Five Civilized Tribes of Indians.

Original action for writ of prohibition by the State of Oklahoma, on the relation of Hall C. Miller and others, against W. A. Huser, as County Judge of Okfuskee County. Writ denied.

Ernest B. Hughes and John G. Ellinghausen, for relators.

Lewis C. Lawson, for respondent.

RAINEY, J. This is an original action filed in this court in the name of the state of Oklahoma, on the relation of Hall C. Miller, Ben H. Cash, and A. V. Rupprecht, wherein it is sought to prohibit W. A. Huser, as county judge of Okfuskee county, Okla., from proceeding under the Act of Congress of June 14, 1918, c. 101, 40 Stat. 606 (U. S. Comp. St. 1918, secs. 4234a, 4234b, Append.), entitled:

"An act to provide for a determination of heirship in cases of deceased members of the Cherokee, Choctaw, Chickasaw, Creek, and Seminole Tribes of Indians in Oklahoma, conferring jurisdiction upon district courts to partition lands belonging to full-blood heirs of allottees of the Five Civilized Tribes, and for other purposes."

Said act reading as follows:

"A determination of the question of fact as to who are the heirs of any deceased citizen allottee of the Five Civilized Tribes of Indians who may die or may have heretofore died, leaving restricted heirs, by the probate court of the state of Oklahoma having jurisdiction to settle the estate of said deceased, conducted in the manner provided by the laws of said state for the determination of heirship in closing up the estates of deceased persons, shall be conclusive of said question: Provided, that an appeal may be taken in the manner and to the court provided by law, in cases of appeal in probate matters generally; Provided further, that where the time limited by the laws of said state for the institution of administration proceedings has elapsed without their institution, as well as in cases where there exists no lawful ground for the institution of administration proceedings in said courts, a petition may be filed therein having for its object a determination of such heirship and the case shall proceed in all respects as if administration proceedings

upon other proper grounds had been regularly begun, but this proviso shall not be construed to reopen the question of the determination of an heirship already ascertained by competent legal authority under existing laws: Provided further, that said petition shall be verified, and in all cases arising hereunder service by publication may be had on all unknown heirs, the service to be in accordance with the method of serving nonresident defendants in civil suits in the district courts of said state; and if any person so served by publication does not appear and move to be heard within six months from the date of the final order, he shall be concluded equally with parties personally served or voluntarily appearing."

"The lands of full-blood members of any of the Five Civilized Tribes are hereby made subject to the laws of the state of Oklahoma, providing for the partition of real estate. Any land allotted in such proceedings to a full-blood Indian, or conveyed to him upon his election to take the same at the appraisement, shall remain subject to all restrictions upon alienation and taxation obtaining prior to such partition. In case of a sale under any decree, or partition, the conveyance thereunder shall operate to relieve the land described of all restrictions of every character."

The principal allegations in the petition are that one Magie Yarhola, a full-blood Creek Indian, died in 1906, seized of an allotment of land in Creek county; that in October, 1918, Walter Templeton, Walter L. Ransom, and L. O. Lytle, filed an application in the county court of Okfuskee county, Okla., setting forth that they were the grantees of one Losanna Lewis, nee West, a restricted Creek Indian heir of the said Magie Yarhola, deceased, and praying for a determination of the heirship of the said Magie Yarhola, deceased. It is further alleged that petitioners in the county court of Okfuskee county caused notice to be given of the filing of said petition, notifying certain designated parties and any unknown heirs of the said Magie Yarhola, deceased, to appear and exhibit their respective claims of heirship, ownership, or interest in said estate on or before January 24, 1919. Relators also allege that all the persons so named either have or claim to have some claim, right, title, or interest in the estate of the said Magie Yarhola, deceased, either by virtue of being the restricted heirs of the said decedent, or by being grantees of such heirs. The petition herein then recites that the county court of Okfuskee county has no jurisdiction of the particular subject-matter of the proceeding attempted to be presented therein, for the reason that long prior to the filing of the petition for the determination of heirship in said court the district court of Creek county had obtained jurisdiction to determine the question sought to be determined in said county court,

and that all those made parties to the proceedings in the county court are parties to the action in the district court wherein the title to the allotment of the decedent is involved, and wherein it is necessary, in order to adjudicate the title to said land as between the same parties, to determine who, in fact, are the heirs of the said decedent. It further appears that petitioners in the county court and relators herein claim through the same alleged heir, to wit, Losanna Lewis, nee West, through conveyances approved by the county courts of Okfuskee and Okmulgee counties, respectively; each set of claimants asserting that the court approving their conveyances was the court having jurisdiction of the settlement of the estate of the deceased allottee. Rebecca Baker, and Peter and Jimmie Davis, full-blood Creek Indians, parties to both proceedings, also claim to be heirs of the decedent.

Counsel for relators, in their briefs, insist that the question for determination in the proceedings instituted in the county court of Okfuskee county, and the question to be determined in the action pending in the district court of Creek county, is the question of fact as to who are the heirs of Magie Yarhola, deceased, and say that petitioners have no plain, adequate, complete, or speedy remedy at law; that their remedy by appeal would be inadequate, for the reason that before such appeal could be determined said cause will, in the usual course of court proceedings, be called for trial in the district court of Creek county, and said relators will be harassed, annoyed, and be put to great expense by being required to try the same question in two different courts; and that they will be greatly injured and damaged by reason of the probability of having conflicting judgments rendered by the said two courts, whereby relators' interests in said estate would be clouded and rendered uncertain.

In entering upon a discussion of the very important and interesting questions presented by the record in this case, we will first consider the objection that the act of Congress is unconstitutional and void, in that it is in contravention of sections 1 and 2 of article 3 of the Constitution of the United States, the pertinent parts of which are as follows:

"The judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish. The judges, both of the Supreme Court and inferior courts, shall hold their offices during good behavior, and shall, at stated times, receive for their services, a compensation, which shall not be diminished during their continuance in office.

"Sec. 2. The judicial power shall extend

to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority;—to all cases affecting ambassadors, other public ministers and consuls;—to all cases of admiralty and maritime jurisdiction;—to controversies to which the United States shall be a party;—to controversies between two or more states;—between a state and citizens of another state;—between citizens of different states;—between citizens of the same state claiming lands under grants of different states, and between a state, or the citizens thereof, and foreign states, citizens or subjects. * * *"

Accepting, for the purposes of discussion, the contention of counsel for relators that "a determination of the question of fact as to who are the heirs of any deceased allottee of the Five Civilized Tribes of Indians" involves the exercise of judicial power, it does not follow that Congress is prohibited from conferring judicial or quasi judicial power upon other courts, boards, commissions, tribunals, or agencies created or designated by it as to cases not embraced within the class of cases specifically mentioned in section 2, supra. Edward Prigg v. Pennsylvania, 16 Pet. 539, 10 L. Ed. 1060; United States v. Winona & St. P. R. Co., 67 Fed. 948, 15 C. C. A. 96; United States v. Archibald A. Ritchie, 17 How. 525, 15 L. Ed. 236; Levin v. United States, 128 Fed. 826, 63 C. C. A. 476; American Ins. Co. v. 356 Bales of Cotton, 1 Pet. 511, 7 L. Ed. 242; Clinton v. Englebrecht, 13 Wall. 434-447, 20 L. Ed. 659; McAllister v. United States, 141 U. S. 174, 188, 11 Sup. Ct. 949, 35 L. Ed. 693; Claflin v. Houseman, 93 U. S. 130, 23 L. Ed. 833; Robertson et al. v. Baldwin, 165 U. S. 275, 17 Sup. Ct. 326, 41 L. Ed. 715; In the Matter of Martin Conner, 39 Cal. 98, 2 Am. Rep. 427.

This principle has been too long recognized by Congress and the courts to justify a recitation of the numerous detailed circumstances under which the power has been applied. Quite a number are mentioned in Levin v. United States, supra, wherein the Circuit Court of Appeals of the Eighth Circuit, speaking through Judge Sanborn, said:

"Nor are the conclusions which contemporaneous construction, time, and practice have adopted without cogent reasons to support them. While it is true that Mr. Justice Story, speaking for the Supreme Court, declared in 1816, in Martin v. Hunter's Lessee, 1 Wheat. 304, 328-333, 4 L. Ed. 79, that the Congress could not vest any portion of the judicial power of the nation in courts which it did not itself ordain and establish, and this statement has since been repeated, the fact is that he was then thinking and speaking of the judicial power granted by sec. 1, and defined by sec. 2, of article 3 of the Constitution. The better opinion now is that the judicial power granted by the former

section, which may be vested in the national courts only, is defined in the latter section; that it necessarily extends only to the trial of 'all cases in law and equity arising under this Constitution,' and to the trial of the other nine classes of cases named in section 2 and specified by Chief Justice Day in his opinion in Chisholm v. Georgia, 2 Dall. 419, 475, 1 L. Ed. 440 (Ex parte Gist, 26 Ala. 156, 162; Claflin v. Houseman, 93 U. S. 130, 139, 23 L. Ed. 833; Robertson v. Baldwin, 165 U. S. 275, 279, 17 Sup. Ct. 326, 41 L. Ed. 715); and that these sections neither expressly nor impliedly prohibit the Congress from conferring judicial power upon other courts, or upon executive or other officers, in other cases, where, in its opinion, the devolution of such power is either necessary or convenient in the execution of the authority granted to the legislative or to the executive department of the government through the Constitution.

"Thus the authority granted to territorial courts to hear and determine controversies arising in the territories of the United States is judicial power. But it is not a part of that judicial power granted by section 1, and defined by section 2, of article 3 of the Constitution. Nevertheless under the constitutional grant to Congress of power to 'make all needful rules and regulations respecting the territory * * * belonging to the United States' (article 4, sec. 3), that body may create territorial courts not contemplated or authorized by article 3 of the Constitution, and may confer upon them plenary judicial power, because the establishment of such courts and the bestowal of such authority constitute appropriate means by which to exercise the congressional power to make needful rules respecting the territory belonging to the United States. American Ins. Co. v. Canter, 1 Pet. 511, 544, 7 L. Ed. 242; Clinton v. Englebrecht, 13 Wall. 434, 447, 20 L. Ed. 659; McAllister v. U. S., 141 U. S. 174, 184, 188, 11 Sup. Ct. 949, 35 L. Ed. 693.

"Of the same nature is the judicial power conferred upon the Secretary of the Interior, the Commissioner of the General Land Office, and his subordinate officers, to hear and determine claims to the public lands of the nation (U. S. v. Winona & St. P. R. Co., 67 Fed. 948, 957, 15 C. C. A. 96, 104); that bestowed upon justices of the peace and other magistrates of the states, by Act Sept. 24, 1789, c. 20, sec. 33, 1 Stat. 91, to arrest and commit or bail persons charged with a violation of the criminal laws of the United States (Ex parte Gist, 26 Ala. 156, 164); that conferred upon the state courts to hear and determine suits by or against corporations and officers created by the nation (Bank of the United States v. Deveaux, 5 Cranch, 61, 3 L. Ed. 38; Claflin v. Houseman, 93 U. S. 135, 23 L. Ed. 833); that given to magistrates of any county, city, or town corporate to hear, determine, and certify the claims of owners of fugitive slaves under Act Feb. 12, 1793, c. 7, 1 Stat. 302, sec. 3 (Prigg v. Pennsylvania, 16 Pet. 539, 615, 620, 621, 10 L. Ed. 1060); that bestowed upon justices of the

peace to arrest, commit to jail, and deliver to the master deserting seamen, under Act July 20, 1790, c. 29, 1 Stat. 131, 134 (Robertson v. Baldwin, 165 U. S. 275, 277, 280, 17 Sup. Ct. 326, 41 L. Ed. 715) ; that conferred upon the courts of the states by the various acts of Congress which empower them to naturalize aliens (1 Stat. 103, 414 ; 2 Stat. 153, 155 ; Rev. Stat. sec. 2165 ; Robertson v. Baldwin, 165 U. S. 275, 17 Sup. Ct. 326, 41 L. Ed. 715 ; Claflin v. Houseman, 93 U. S. 130, 140, 23 L. Ed. 833 ; In the Matter of Martin Conner, 39 Cal. 98, 101, 2 Am. Rep. 427) ; and that granted by act of Congress to executive officers of the United States and to courts and magistrates of the states in numerous other instances, not to try and determine the cases specified in section 2 of article 3 of the Constitution, but to perform the judicial function of hearing and determining other questions and issues which a proper exercise of the powers granted to the various departments of the government required to be thus decided. The grant by the Congress of the United States of the judicial power to admit aliens to citizenship, and to hear and decide the various questions which do not arise in the cases specified in article 3 of the Constitution, but which a proper exercise of the powers granted by that instrument to the executive or to the legislative department of the government requires to be judicially decided, was neither expressly nor impliedly prohibited by that article. The congressional power to make such a grant, and to vest judicial authority in state courts and officers, in such cases, exists by virtue of the established rule that the grant of a power to accomplish an object is a grant of the authority to select and use the appropriate means to attain it."

The early case of Prigg v. Pennsylvania, supra, involved the constitutionality of an act of Congress conferring upon any magistrate of any county, city, or town corporate, jurisdiction to hear and determine claims of owners of fugitive slaves under an act of Congress, and the rule was there enunciated by the Supreme Court of the United States that the national government, through its legislative, executive, and judicial departments, was bound to carry into effect all the rights and duties imposed upon it by the Constitution in the absence of positive provisions in the Constitution to the contrary. The court, speaking through Mr. Justice Story, said :

"We hold the act to be clearly constitutional, in all its leading provisions, and, indeed, with the exception of that part which confers authority upon state magistrates, to be free from reasonable doubt and difficulty, upon the grounds already stated. As to the authority so conferred upon state magistrates, while a difference of opinion has existed, and may exist still, on the point, in different states, whether state magistrates are bound to act under it, none is entertained by this court that state magistrates may, if they choose, exercise that authority, unless prohibited by state legislation."

According to the averments in the complaint, the deceased allottee and his heirs are tribal Indians of the Creek Tribe of Indians, all being of the full-blood, according to the approved rolls, and as to the lands inherited by said heirs from the deceased allottee "the restrictions are not removed, but merely relaxed or qualified to the extent of sanctioning such conveyances as received the court's approval." Parker v. Richard et al., 250 U. S. 235, 39 Sup. Ct. 442, 63 L. Ed. —, filed June 2, 1919.

In such circumstances the power and duty of the general government to legislate for them and their property during the continuance of the national guardianship over them has been too long and too well established to admit of discussion. Beginning with the cases of Cherokee Nation v. Georgia, 30 U. S. (5 Pet.) 1, 8 L. Ed. 25, and Lone Wolf v. Hitchcock, 187 U. S. 565, 23 Sup. Ct. 216, 47 L. Ed. 306, down to comparatively recent cases, such as Brader v. James, 246 U. S. 88, 38 Sup. Ct. 285, 62 L. Ed. 591, it has been the consistent holding of the Supreme Court of the United States that the management of the Indians and their estates was an administrative and political function not subject to the control or interference of the courts. United States v. Kagama et al., 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed. 228 ; Heckman v. United States, 224 U. S. 413, 32 Sup. Ct. 424, 56 L. Ed. 820 ; Marchie Tiger v. Western Investment Co., 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738 ; Pam-To-Pee v. United S. 445. 19 Sup. Ct. 722, 43 L. Ed. 1041 ; Roff Ed. 221 ; Stephens v. Cherokee Nation, 174 U. S. 445, 19 Sup. Ct. 722, 43 L. Ed. 1041 ; Roff v. Burney, 168 U. S. 218, 18 Sup. Ct. 60, 42 L. Ed. 442 ; United States v. Thomas, 151 U. S. 577, 14 Sup. Ct. 426, 38 L. Ed. 276 ; Sizemore v. Brady, 235 U. S. 441, 35 Sup. Ct. 135 59 L. Ed. 308.

We quote from two of the recent cases, Roff v. Burney and Brader v. James, supra. In the first case the court said :

"The condition of the Indians and Indian tribes within the limits of the United States is anomalous. The tribes, though in certain respects regarded as possessing the attributes of nationality, are held to be not foreign, but domestic dependent nations. Cherokee Nation v. Georgia, 30 U. S. (5 Pet.) 1, 8 L. Ed. 25 ; Worcester v. Georgia, 31 U. S. (6 Pet.) 515, 8 L. Ed. 483 ; Choctaw Nation v. United States, 119 U. S. 1 (7 Sup. Ct. 75), 30 L. Ed. 306 ; Cherokee Nation v. Kansas Railway Company, 135 U. S. 641 (10 Sup. Ct. 965), 34 L. Ed. 295. While the Indians and the territory which may have been specifically set apart for their use are subject to the jurisdic-

tion of the United States, and Congress may pass such laws as it sees fit prescribing the rules governing the intercourse of the Indians with one another and with citizens of the United States, and also the courts in which all controversies to which an Indian may be a party shall be submitted (United States v. Rogers. 45 U. S. [4 How.] 568, 11 L. Ed. 1105; United States v. Kagama, 118 U. S. 375 [6 Sup. Ct. 1109], 30 L. Ed. 228; Gonshay-ee, Petitioner, 130 U. S. 343 [9 Sup. Ct. 542]. 32 L. Ed. 973; Cherokee Nation v. Kansas Railway Company, supra), the mere fact that a citizen of the United States has become a member of an Indian tribe by adoption may not necessarily cancel his citizenship."

In the second we find this explicit language.:

"In view of the repeated decisions of this court, we can have no doubt of the constitutionality of such legislation. While the tribal relation existed, the national guardianship continued, and included authority to make limitations upon the rights which such Indians might exercise in respect to such lands as are here involved. This authority did not terminate with the expiration of the limitation upon the rights to dispose of allotted lands; the right and duty of Congress to safeguard the rights of Indians still continued. It has been frequently held by this court that the grant of citizenship is not inconsistent with the right of Congress to continue to exercise this authority by legislation deemed adequate to that end. It is unnecessary to again review the decisions of this court which support that authority. Some of them were reviewed in the Tiger Case. The doctrine is reiterated in Heckman v. United States, 224 U. S. 413 (32 Sup. Ct. 424, 56 L. Ed. 820), and United States v. Nice, 241 U. S. 591, 598, 60 L. Ed. 1192, 1193, 36 Sup. Ct. 696."

And in another part of the opinion the court said:

"Notwithstanding Rachel James might have conveyed the homestead allotment after it descended to her, she was a tribal Indian, and as such still subject to the legislation of Congress enacted in discharge of the nation's duty of guardianship over the Indians. Congress was itself the judge of the necessity of legislation for this purpose; it alone might determine when this guardianship should cease."

Inasmuch, then, as the government of the Indians and their property and affairs is a political and an administrative function, it is entirely competent for Congress to delegate administrative duties upon courts, commissions, boards, tribunals, or other agencies.

But it is insisted that Congress may not confer particular judicial power on a particular state court so as to permit such state court to exercise jurisdiction in cases where the Constitution and laws of the state prohibit the court from acting on like matters,

especially where under the laws and the Constitution of said state other courts are clothed with the jurisdiction thus attempted to be conferred. Summarized, the argument on this proposition is, as we understand it: First, that at the time of the passage of the act under consideration the district courts of this state had jurisdiction, by virtue of laws theretofore enacted by Congress conferring jurisdiction generally on said courts over the persons and property of Indians of the Five Civilized Tribes, to determine the heirship of deceased Indians, which jurisdiction included cases where the decedent and his heirs were restricted members of said tribes; second, that section 12, art. 7, of the Constitution of Oklahoma, denies jurisdiction to the county courts in any matter wherein the title to land may be in dispute or called in question, and that under said section county courts only have jurisdiction to determine heirship as an incident to administration proceedings, which makes that part of the act of Congress unconstitutional which attempts to confer jurisdiction on said courts to determine heirship "where the time limited by the laws of said state for the institution of administration proceedings has elapsed without their institution, as well as in cases where there exists no lawful ground for the institution of administration proceedings in said courts."

We agree with counsel for relators that before the passage of the Act of June 14, 1918, supra, district courts of this state had jurisdiction of actions involving Indian allotments, and as an incident to the adjudication of titles in actions of ejectment to cancel conveyances, to quiet title, or other actions, said courts were authorized, where necessary to a decision of the case, to determine as between the parties to the action, including restricted Indians, the question of who, in fact, were the heirs of the decedent. Jurisdiction of such actions has been entertained without question by both state and federal courts, and we have no doubt that the final judgments rendered in such cases by said courts have the same binding force and effect on the parties over which the court had jurisdiction in the particular case as to all questions necessarily involved in the suit as like judgments of courts of general jurisdiction. But the fact that said courts did have jurisdiction of such questions did not deprive Congress, in performing its duties and obligations to these Indians, of its power, so far as these restricted Indian heirs are concerned with reference to their restricted lands, to withdraw the jurisdiction that it had theretofore conferred on said courts and to confer it upon any other commission, court, board;

or tribunal, as it saw fit. McKay v. Kalyton, 204 U. S. 458, 27 Sup. Ct. 346, 51 L. Ed. 566; Hallowell. v. Commons, 239 U. S. 506, 36 Sup. Ct. 202, 60 L. Ed. 409; 'Pel-Ata-Yakot v. United States (C. C.) 188 Fed. 387; Brader v. James. 246 U. S. 88, 38 Sup. Ct. 285, 62 L. Ed. 591; Wilson v. Wall, 73 U. S. (6 Wall.) 83, 18 L. Ed. 727; Reichert v. Felps, 73 U. S. (6 Wall.) 160, 18 L. Ed. 849; Jones v. Meehan, 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49; Caesar v. Krow, 71 Oklahoma, 176 Pac. 927.

As to whether Congress intended, or whether the act had the effect, to withdraw the jurisdiction theretofore exercised by such district courts, and as to whether the county courts, in exercising the power or authority conferred by the act, do so as courts or merely as administrative agencies of the government, will be hereinafter considered. · At present we will notice the contention that the Constitution and laws of this state prohibit county courts from exercising jurisdiction "in any matter wherein the title or boundaries of land may be in dispute or called in question." Nor need we say, though it is extremely doubtful, whether in the determination of heirship the title of land is in dispute or called in question. Fitzpatrick v. Simonson Bros., 86 Minn. 140, 90 N. W. 378; Fischer v. Sklenar, 101 Neb. 553, 163 N. W. 861. We call attention, however, to the fact that under section 9 of the Act of May 27, 1908 (35 Stat. at L. 312 c. 199), the act of a county judge of the court having jurisdiction of the settlement of the estate of the deceased allottee in approving conveyances executed by full-blood Indian heirs to inherited lands is the act of the court as distinguished from the act of the judge thereof. MaHarry v. Eatman, 29 Okla. 46, 116 Pac. 935; Tiger et al. v. Creek County Court, 45 Okla. 701, 146 Pac. 912. Said act, nevertheless, is not a judicial act, but is the act of an administrative or ministerial agency designated by Congress for the protection of the Indians. Parker v. Richard et al., supra; Brader v. James, supra; Barnett v. Kunkle (C. C. A.) 256 Fed. 644.

It is significant that, during the eleven years said act has been in force and effect, in the numerous controversies which have arisen concerning the legality of conveyances of these lands it has never been held that the county courts are prohibited from performing the duties imposed on them by the act on the ground that the title of land is in dispute or called in question. But if we accept, for the purpose of discussion. counsel's premise that a determination of heirship affects the title of the land within the meaning of section 12, art. 7, of the state Constitution, supra, we differ widely on the effect of the

provision as applied to the instant case. The Constitution, laws, and treaties of the United States are the supreme law of the land, and, although, within the limits of state sovereignty, the national government cannot interfere with the states, on the other hand, the states cannot interfere with the government of the United States in the exercise of its constitutiona. powers. In the language of Chief Justice Marshall, in McCullough v. Maryland, 17 U. S. (4 Wheat.) 316, 4 L. Ed. 579:

"If any one proposition could command the universal assent of mankind, we might expect it would be this—that the government of the Union, though limited in its powers, is supreme within its sphere of action.· This would seem to result necessarily from its nature. It is the government of all; its powers are delegated by all; it represents all, and acts for all. Though any one state may be willing to control its operations, no state is willing to allow others to control them. The nation, on those subjects on which it can act. must necessarily bind its component parts. But this question is not left to mere reason; the people have, in express terms, decided it by saying, 'this Constitution and the laws of the United States, which shall be made in pursuance thereof,' 'shall be the supreme law of the land,' and by requiring that the members of the state legislatures, and the officers of the executive and judicial departments of the states, shall take the oath of fidelity to it.

"The government of the United States, then, though limited in its powers, is supreme; and its laws, when made in pursuance of the Constitution, form the supreme law of the land, 'anything in the Constitution or laws of any state to the contrary notwithstanding.' "

The plenary authority of Congress to legislate for these Indians concerning their restricted lands cannot be limited or impaired by any state law, and in section 1 of the Enabling Act for the admission of the state of Oklahoma into the Union, Congress reserved the authority of the national government over the Indians, their lands and property, which it had prior to the passage of the act. Marchie Tiger v. Western Inv. Co., 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738. The language employed is comprehensive and exact, and is as follows:

"That the inhabitants of all that part of the area of the United States now constituting the territory of Oklahoma and the Indian Territory, as at present described, may adopt a Constitution and become the state of Oklahoma, as hereinafter provided: Provided, that nothing contained in the said Constitution shall be construed to limit or impair the rights of persons or property pertaining to the Indians of said territories (so long as such rights shall remain unextinguished) or to limit or affect the authority of the gov-

ernment of the United States to make any law or regulation respecting such Indians, their lands, property, or other rights by treaties, agreement, law, or otherwise, which it would have been competent to make if this act had never been passed." (Act June 16, 1906, c. 3335, 34 Stat. L. 267).

The people of the new state, in their Constitution, accepting this reservation in unequivocal language, as appears from section 3, art. 1, Williams' Constitution, which reads:

"The people inhabiting the state do agree and declare that they forever disclaim all right and title in or to any unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian tribe, or nation; and that until the title to any such public land shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal, and control of the United States. Land belonging to citizens of the United States residing without the limits of the state shall never be taxed at a higher rate than the land belonging to residents thereof. No taxes shall be imposed by the state on lands or property belonging to or which may hereafter be purchased by the United States or reserved for its use."

In the light of this provision of our Constitution, which must be taken into consideration in construing section 12, art. 7, of the same instrument, it may well be doubted whether there is anything in our Constitution prohibiting county courts from exercising the power and authority conferred by the Act of June 14, 1918, so far as restricted Indians and their property are concerned, even though a determination of the question of heirship by such courts should affect the title of the land; but, however this may be, in view of the governing principles heretofore alluded to, there can be no doubt that section 12, art. 7, supra, has no application in such cases. The state Legislature has not prohibited the county courts from exercising the authority conferred on them by the Act of June 14, 1918, but, on the contrary, has specifically sanctioned it. Chapter 25, Sess. Laws, 1919. And in view of section 1 of the Enabling Act, and section 3, art. 1, of our state Constitution, it is entirely logical that the state government cannot prohibit its exercise and thus defeat the object and purpose of Congress concerning a subject over which it has exclusive control.

Firmly convinced, as we are, as to the power of Congress to enact the legislation under consideration and to confer upon county courts, as courts, jurisdiction to determine heirship, we come to a consideration of the most serious and difficult question in the case, which is to ascertain the nature of the power conferred, whether strictly judicial or ministerial, and the scope and purpose of the act. But let us first see whether Congress may confer duties upon administrative or ministerial officers or agencies which involve the exercise by them of judicial power. In the light of the adjudicated cases there can arise no question as to the right of Congress so to do.

In the case of Ross v. Stewart, 227 U. S. 530, 33 Sup. Ct. 345, 57 L. Ed. 627, involving the decision of the town-site commission in the Cherokee Nation, the contention was made that the commission was without jurisdiction to pass upon the contest and that only courts could exercise such power. Unquestionably the town-site commission exercised judicial power in deciding contest cases arising before it under the act of Congress, but still they were merely administrative officers of the United States government. In disposing of the contention, the court, speaking through Mr. Justice Van Devanter, said:

"We are asked to say, as was the state court, that the town-site commission was without jurisdiction to entertain or pass upon the contest resulting from the conflicting applications to purchase, and that such a controversy could be determined only in the courts. But, like the state court, we are unable so to say. No time need be spent in upholding the power of Congress to invest the town-site commission with such authority, for our prior decisions leave no doubt upon that subject. It is merely a question of what Congress intended by the legislation adopted."

"The town-site commission for a town in the Cherokee Nation must be deemed to have been given jurisdiction to entertain and pass upon a contest resulting from conflicting applications to purchase by the Acts of June 28, 1898 (30 Stat. at L. 495, c. 517), May 31, 1900 (31 Stat. at L. 221, c. 598), and July 1, 1902 (32 Stat. at L. 716, c. 1375), the contrary view finding no support in any statutory provision, being opposed to the plain implication of this legislation, and ignoring the settled practice of Congress to commit such questions to the determination of administrative officers."

See case, 25 Okla. 611, 106 Pac. 870.

In United States v. Winona & St. P. R. Co., 67 Fed. 948, 15 C. C. A. 96, the first paragraph of the syllabus is as follows:

"The land department of the United States (including in that term the Secretary of the Interior, the Commissioner of the General Land Office, and their subordinates) is a special tribunal vested with judicial power to hear and determine the claims of all parties to the public land which it is authorized to dispose of, and also with power to execute its judgments by conveyances to the parties it decides are entitled to them."

In the body of the opinion, the court, speaking through Judge Sanborn, said:

"In every case there must, in the nature of things, be a decision of questions of fact and of questions of law, because in every case the ultimate question is whether or not the facts proved show that the claimant is entitled to the land, under the acts of Congress. A certificate or patent is the record evidence of the judgment of this tribunal, and it necessarily follows that, when such a judgment is rendered in a case within the jurisdiction of the land department, it is like the judgments of other special tribunals, vested with judicial powers, impervious to collateral attacks."

From the inception of our government, Congress, on numerous occasions, has conferred upon the officers of the government legislative, judicial, and executive powers, and these officers have exercised and are now exercising strictly legislative or judicial powers in the performance of duties delegated by Congress. The statutes of the United States are replete with instances, where such authority is conferred upon the executive department with reference to the enforcement of the laws of the United States. Legislative and judicial power may be delegated to the Secretary of War. Union Bridge Co. v. United States, 204 U. S. 364, 27 Sup. Ct. 367, 51 L. Ed. 523. In this case it appears that Congress delegated to the Secretary of War the duty and power of determining whether certain bridges were an unreasonable obstruction to free navigation so as to interfere with interstate commerce. In sustaining the validity of the act, the court, speaking through Mr. Justice Harlan, said:

"By the statute in question, Congress declared in effect that navigation should be freed from unreasonable obstructions arising from bridges of insufficient height, width of span, or other defects. It stopped, however, with this declaration of a general rule, and imposed upon the Secretary of War the duty of ascertaining what particular cases came within the rule' prescribed by Congress, as well as the duty of enforcing the rule in such cases. In performing that duty the Secretary of War will only execute the clearly expressed will of Congress, and will not, in any true sense, exert legislative or judicial power. He could not be said to exercise strictly legislative or judicial power any more, for instance, than it could be said that executive officers exercise such power when, upon investigation, they ascertain whether a particular applicant for a pension belongs to a class of persons who, under the general rules prescribed by Congress, are entitled to pensions. If the principle for which the defendant contends received our approval, the conclusion could not be avoided that executive officers, in all the departments, in carrying out the will of Congress, as expressed in statutes enacted by it, have, from the foundation of the national government, exercised and are now exercising powers, as to mere details, that are strictly legislative or judicial in their nature. This will be apparent upon an examination of the various statutes that confer authority upon executive departments in respect of the enforcement of the laws of the United States. Indeed, it is not too much to say that a denial to Congress of the right, under the Constitution, to delegate the power to determine some fact or the state of things upon which the enforcement of its enactment depends, would be 'to stop the wheels of government' and bring about confusion, if not paralysis, in the conduct of the public business."

In the approval of conveyances executed by full-blood Indian heirs under section 9 of the Act of May 27, 1908 (35 Stat. L. 312), it is the duty of the court to make sufficient investigation to satisfy it that the consideration paid is just and equitable and for the best interest of the grantor, and, although this involves judicial power, it is not strictly judicial power, but is administrative. Barnett v. Kunkle, supra; Parker v. Richard, supra.

In the last-named case the court said:

"That the agency which is to approve or not is a state court is not material. It is the agency selected by Congress and the authority confided to it is to be exercised in giving effect to the will of Congress in respect of a matter within its control. Thus in a practical sense the court in exercising that authority acts as a federal agency, and this is recognized by the Supreme Court of the state. Marcy v. Board of Commissioners, 45 Okla. 1, 144 Pac. 611."

If it is competent for Congress to decide the question, it may delegate that authority to some administrative officer. This it has done with respect to the determination of heirship of restricted Indians by the Secretary of the Interior during the trust period. Bond v. United States (C. C.) 181 Fed. 613; McKay v. Kalyton, supra.

It is within the power of Congress to say, in the first instance, according to what law of descent restricted lands shall descend, and it is certainly within its power to intrust administrative officers with the ascertainment of facts necessary to effectuate its purposes, and to provide for a determination of heirship as a question of fact, which simply amounts to a declaration of the persons on whom the law casts the succession—it finds a fact and fixes a status. Fischer v. Sklenar et al., supra.

Was the power conferred strictly judicial or quasi judicial and administrative? Was it intended, after the passage of the act, that the district courts of the state should no longer exercise jurisdiction over cases involving the title to inherited lands

where the question to be adjudicated depended upon the determination of heirship?· The decisions in Bond v. United States, supra, and McKay v. Kalyton, supra, give some basis for the contention that the act had such an effect. Under the Act of Congress of June 25, 1910, c. 431, 36 Stat. 855, providing that, if an allottee dies before the expiration of the trust period and the issuance of a patent without having disposed of his allotment by will, the Secretary of the Interior shall ascertain the legal heirs of such decedent, and his decision shall be final and conclusive, it has been held that said act operated to repeal the Act of Congress of February 6, 1901, c. 217, 31 Stat. 760 (U. S. Comp. St. secs. 4214, 4215), conferring jurisdiction on the Circuit Courts of the United States over controversies growing out of the execution of the allotment act, and deprived said courts of jurisdiction to determine such heirship, and, since the act of 1910 contained no saving clause, the authority of the courts under the repealed act of 1910 immediately ceased in so far as pending causes were concerned. This court has followed the cases cited, and held that the district court of Pawnee county did not have jurisdiction of an action to try title to the allotment of a deceased Pawnee Indian before the expiration of the trust period where the question of heirship was necessarily involved, because such authority was vested solely in the Secretary of the Interior. Caesar v. Krow, supra.

In construing the Act of June 25, 1910, the court, in McKay v. Kalyton, supra, emphasized two elements which do not affect the act we are now considering. This appears from the following excerpt:

"State courts were not given jurisdiction of controversies necessarily involving the determination of the title, and, incidentally, of the right to the possession, of Indian allotments while the same were held in trust by the United States, by the provision of the Act of August 15, 1894 (28 Stat. at L. 286, c. 290), delegating to the federal Circuit Courts the power to determine such questions, since the purpose of that act to continue the exclusive federal control over disputes concerning allotments which prior to that act could only have been decided by the Secretary of the Interior is manifested by its provision that a judgment or decree in any such controversy shall be certified by the court to the Secretary of the Interior, and by the provision of the Act of February 6, 1901 (31 Stat. at L. 760, c. 217), that in such suits 'the parties thereto shall be the claimant as plaintiff and the United States as party defendant.' "

After an extended and careful consideration of the act under consideration, we have concluded that its purpose and effect was not to deprive the state courts of jurisdiction of actions involving the title to allotments inherited by restricted Indian heirs of the Five Civilized Tribes, even though such actions are dependent upon heirship. In interpreting the statute we must give effect, if possible, to the intent of Congress, and in ascertaining what was intended we should interpret its language in such a manner as, consistent with the words employed, to completely effectuate the object of Congress. If by one mode of interpretation the end sought to be attained will not be substantially subserved, and the evil sought to be prohibited will, in a large measure, still exist, or a worse condition is created, that mode should not be adopted if the language is susceptible of any interpretation that will secure its manifest purpose. Let us, for a moment, examine and notice the evil existing at the time of the enactment which Congress sought to remedy. Under section 9, of the Act of May 27, 1908, the death of an allottee of any of the Five Civilized Tribes operated to remove all restrictions from said allottee's land, and the land descended, free of restrictions, to the said allottee's heirs according to the Oklahoma law of succession, except that as to full-blood Indian heirs the restrictions were only qualifiedly removed and their conveyances were only effectual when approved by the county court having jurisdiction of the settlement of the estate of the deceased allottee. Section 3 of the same act provides that the approved rolls of citizenship and of freedmen of the Five Civilized Tribes shall be conclusive evidence as to the quantum of Indian Blood of any enrolled citizen or freedman of said tribes, and that the enrollment records of the Commissioner to the Five Civilized Tribes shall be conclusive evidence as to the age of said citizen or freedman to determine questions arising under the act.

In determining the validity of conveyances executed by virtue of the provisions of this act, it was always pertinent, among other things, to determine the quantum of blood of the Indian grantor, his age, and the heirship; that is, those who succeeded to his inheritance. The county courts, which were authorized to approve conveyances of the full-blood Indian heirs under section 9 of the act, as we have seen, acted as administrative agencies, and under the act authority was not delegated to such courts to determine who, in fact, the heirs were. The approval by the proper court simply had the effect of vesting in the grantee whatever interest, if any, the Indian grantor had in such land. It is a matter of common knowledge,

as disclosed by the records of this and the United States courts, that many suits arose involving lands of great value which were dependent upon the question of who, in fact, were the heirs of the decedent. For reasons which have frequently been stated by the courts, and which it is not necessary to restate here, the question of heirship proved difficult of solution as between conflicting claimants, and although, as we have already seen, the judgments of the courts having jurisdiction of actions to try the title to the land were binding as to the parties to the record, said judgments did not bind or foreclose other claimants, and the question of heirship remained unsettled so long as there was a claimant whose right had not been litigated. This uncertainty as to the heirship in many instances worked serious injury to the Indian heirs and greatly depreciated the value of their inheritance, for on this account purchasers were reluctant to pay full value for the land. It restricted competitive bidding, and often the inheritance went to speculators who were willing to take a chance.

Now, it seems clear to us that it was the intent of Congress to provide a method that would settle the question of heirship as a question of fact as against the world, for the act provides for service upon unknown heirs in accordance with the method of serving nonresidents in civil actions in the district courts of the state, and provides that, if any person so served fails to appear and move to be heard within six months from the date of the final order, "he shall be concluded equally with parties personally served or voluntarily appearing." Nor do we think Congress had in mind solely the determination of heirship for the purpose of establishing with certainty and finality the identity and status of the restricted Indian heirs to whom the deceased's allotment passed at his death. Under previous acts of Congress the heirs of enrolled deceased members of the Five Civilized Tribes became entitled to the decedent's pro rata share of the tribal funds. Congress, from time to time, has appropriated out of such tribal funds a stipulated amount of money per capita to be paid to living members and to heirs of deceased members. In carrying out this duty it has become necessary for the administrative officers of the government to determine who the heirs were in order to make payment to the right parties. Although no specific authority was given to determine heirship, it is one that necessarily flowed from the duty imposed on such administrative officers. The task has proved burdensome and unsatisfactory, because of the failure

of Congress to provide any definite procedure to be followed in determining the question. In practice these administrative officers, in determining the heirship of deceased allottees, have relied upon what information was obtainable from the approved rolls and enrollment records, which, in many cases, was very meager, and which it became necessary to supplement by affidavits and proofs of heirship made by claimants to the funds and those vouching for them. These proofs of heirship were made ex parte and were often indefinite or conflicting. So, from these considerations we think that Congress intended by the act to establish a method for a determination of the fact of heirship which would be binding upon its administrative officers, the courts, or other tribunals wherein the question might arise in ascertaining and protecting the rights of these wards of the government to their inherited lands or shares of the tribal funds.

The reports of the Senate and House Committees of Congress recommending the passage of the act substantiate this view. The Senate Committee report states:

"This bill is identical with H. R. 10590 as reported by the House Committee on Indian Affairs on March 19, 1918. The legislation is urged by W. P. Z. German, general attorney of the Federal Land Bank of Wichita, Kan., who states that under existing conditions titles based on deeds from the heirs of deceased full-blood Indians offered to the land bank as security for loans have to be rejected as it is impossible to know with certainty who the heirs of a deceased full-blood Indian are, because no court, under existing law, can judicially determine conclusively that question."

There is incorporated in both reports for the information of Congress a brief bearing on the question by Hon. W. F. Semple, now Principal Chief of the Choctaw Nation, who, at the time of making the reports, was a Choctaw Indian attorney and had formerly been one of the probate attorneys for the Five Civilized Tribes and clerk to the Committee on Indian Affairs.

We quote two paragraphs from his brief:

"The federal government through the farm-loan banks is loaning millions of dollars to actual farmers throughout the country on first mortgages on farms, and the records will show that in the state of Kansas something over six millions have been loaned to farmers, while in the state of Oklahoma less than half that amount has been loaned. The difference in the amount of money loaned is to be attributed to the fact the title examiner for the federal farm-loan bank declines to approve titles acquired from heirs who are Indians of the full-blood for the reason that there can be no judicial determination of heirship in such cases which will be binding and

preclude other Indians from coming into court and asserting an interest in the land.

\* \* \*

"The need for legislation of this kind is made necessary not only for the reason that titles are uncertain and the uncertainty has the effect of diminishing the market value of the land, but further, the reason that there is a considerable amount of money in the hands of the superintendent of the Five Civilized Tribes, in the form of per capita payments, which has not been distributed for the reason that there is no means of determining who are the heirs. The department has followed the practice of making these payments on affidavits of Indians that they are the lawful heirs, but this has resulted in injustice being done. In fact it is a very unsatisfactory way of determining the heirs, and unless a commission is sent out with authority to take testimony and hear conflicting claims this policy will result in grave injury being done in distributing the large sums of money now in the hands of the superintendent belonging to the Choctaws and Chickasaws."

To attain this object we have already seen that it was competent for Congress to create its own commission, boards, courts, or other agencies, and to provide the procedure to be followed by such agencies in order to discharge the duties so imposed. Likewise, it was within the power of Congress, if it saw fit, to make use of courts already created, such as the county courts, as administrative agencies, and it was also within the power of Congress to provide that such agencies should use the procedure already established by the laws of the state as instrumentalities in obtaining this object, instead of creating an entirely new mode of procedure. We have no doubt, also, that Congress had the right to make use of all the existing procedure or any part thereof, or, if the existing procedure was not sufficient, to supplement it. If the procedure already established for the state courts had been considered sufficiently comprehensive, Congress would doubtless have omitted that language found in the second proviso relative to cases where the time limited by the law of the state for the institution of administrative proceedings has elapsed and to those where no lawful grounds existed for the institution of such proceedings. Realizing that in many instances administrative proceedings had never been instituted over the estates of deceased allottees, and that in other cases, although proceedings had been instituted, the same had been closed without heirship having been determined, and in order to make clear its intent to provide for the determination of heirship in all cases where the deceased allottee left restricted Indian heirs, Congress, by the terms of the second proviso, evinced a purpose to supplement the procedure already existing in the state courts under the state law by providing a procedure to determine heirship in the two classes of cases thus mentioned, as well as in cases where it was practical to follow the procedure according to the state law.

The wrong impression under which counsel for relators are laboring apparently grows out of the fact that Congress designated state courts as the agencies to determine heirship as a question of fact, instead of some other individual, board or commission; but this, as already stated, is immaterial. Had Congress delegated the power and authority conferred by the act to the Commissioner to the Five Civilized Tribes or to the county clerk of the county of the deceased allottee's residence, and had provided substantially the same procedure to guide such administrative officers in obtaining the desired end, which it certainly could have done, it is clear that no state law or constitutional provision could have defeated or impaired the exercise of that power. So, when we bear in mind that the county courts, in proceedings under the act, are acting merely as federal agencies and as administrative officers, as distinguished from courts exercising strictly judicial powers, it is equally clear that the laws of the state cannot be asserted to defeat or impair the operation of the act.

That Congress did not intend to disturb existing judgments of the district and superior courts where the question of heirship was necessarily involved as to the parties over which the court had jurisdiction is evident from the use of the following language:

"But this proviso shall not be construed to reopen the question of the determination of an heirship, already ascertained by competent legal authority under existing laws."

Counsel for relators propound this question:

"What significance is to be gathered from the fact that Congress used the phrase 'question of fact?' Was it because it thought it would not be conferring judicial power by merely giving the county court the power to ascertain this question as a fact?"

They insist that, if the county court is to stay within the bounds fixed by Congress, the act is utterly incapable of being enforced, for the reason that a determination of such question as a "question of fact" is both a legal and logical impossibility. We have no hesitancy in answering the question propounded in the affirmative. As has been often held, in every case there are questions of fact and questions of law. This is recog-

nized in our Code, for by section 4989 it is provided:

"Kinds of Issues.—Issues arise on the pleadings, where a fact or conclusion of law is maintained by one party, and controverted by the other. There are two kinds: First, of law. Second, of fact."

As to the trial of such issues section 4993 provides:

"Trial of Issues.—Issues of law must be tried by the court, unless referred. Issues of fact arising in actions for the recovery of money, or specific real or personal property, shall be tried by a jury, unless a jury trial is waived, or a reference be ordered, as hereinafter provided."

For illustration, if an ejectment action is instituted by parties claiming to be the heirs of a decedent and as such are entitled to the inheritance, and there is a dispute and conflicting evidence as to whether the respective claimants are related to the decedent, and, if so, in what degree, this conflicting evidence is submitted to the jury for its decision on the facts under the law, while the law is given to the jury by the court in its instructions. The words "the question of fact" were employed by Congress to make clear its purpose that the agencies designated were to exercise administrative functions as distinguished from strictly judicial functions.

We are of the opinion then that, when heirship of a deceased allottee leaving restricted Indian heirs is established as a question of fact by the county courts as administrative agencies of the federal government under the procedure provided by the act, such determination becomes conclusive evidence of that fact and bears the same relation to that issue, when the same arises in an action in the courts, as do the approved rolls as to quantum of blood and the enrollment records as to the age of a member of said tribes.

Therefore, it is our opinion that the district courts were not ousted of jurisdiction of actions pending or deprived of jurisdiction of actions that may hereafter be instituted involving the title to lands inherited by restricted Indian heirs by the passage of the act. When the case proceeds to trial, if it becomes necessary to prove the degree of blood of the Indian grantor, the approved rolls may be introduced for that purpose; if it becomes necessary to prove the age of the Indian grantor, the enrollment record may be introduced for that purpose; and, if it becomes necessary to establish who are the heirs as a question of fact, the determination by the county court, if it has been had, may be introduced for that purpose, and

each, when introduced, becomes conclusive of the question. If the case is called for trial in the district court, after the institution of the proceedings in the county court and before the conclusion thereof, the party desiring to make proof of heirship may present his motion to the district court for a continuance on account of the absence of evidence material to his case, which doubtless will be granted upon a showing of due diligence. In the event of a denial of such motion, the action of the court will be subject to review on appeal. We think, however, the district courts should give a reasonable opportunity to procure this evidence; but we do not think said courts are ousted as to jurisdiction of pending cases or prohibited from exercising jurisdiction over cases hereafter instituted where the title of land is involved and it is necessary to prove, as an incident thereto, who, in fact, are the restricted Indian heirs of the deceased allottee. To hold otherwise would result in chaos, and we would have the district courts deprived of jurisdiction of such actions and the county courts clothed therewith without power to execute their judgments or to afford adequate relief to all parties.

From what we have said it follows that the writ of prohibition should be, and is, denied.

All the Justices concur.